UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SHEA ARMSTRONG and SAMUEL CALDWELL, on behalf of themselves and all others similarly situated,<br><br>          Plaintiff,<br>v.<br><br>BMW OF NORTH AMERICA, LLC, and BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT,<br><br>          Defendants. | **Civil Action No. 23-3046 (JXN) (JBC)**<br><br><br>**OPINION** |

**NEALS**, District Judge:

This matter comes before the Court on Defendant BMW of North America, LLC's ("BMW" or "Defendant's") motion to dismiss (ECF No. 39) Plaintiff Shea Armstrong ("Armstrong") and Samuel Caldwell's ("Caldwell") (together, the "Plaintiffs'") second amended class action complaint (ECF No. 21) (the "SCAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). Jurisdiction and venue are proper pursuant to pursuant to 28 U.S.C. §§ 1332, 1367, and § 1391 respectively. The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule. 78.1(b). For the reasons set forth below, Defendant's motion to dismiss is **GRANTED IN PART**.

I.    **BACKGROUND AND PROCEDURAL HISTORY**

This putative class action arises from an alleged "latent defect found" in certain BMW vehicles (the "Class Vehicles").  (SCAC ¶ 1).[1] According to Plaintiffs, the Class Vehicles "contain defectively designed and/or manufactured coolant lines that cause them to prematurely fail . . . ." which Defendants failed to disclose. (*Id.* at ¶ 2).

On October 4, 2020, Armstrong "purchased a certified pre-owned 2017 530i" BMW from a "BMW dealership located in Glendale, California." (*Id.* ¶ 20).   In August 2021, Armstrong "noticed that engine coolant was leaking from his engine compartment and that his dashboard indicated his vehicle was low on engine coolant." (*Id.* ¶ 23).   On August 24, 2021, Armstrong "brought his vehicle to BMW of Buena Park in Buena Park, California" who "diagnosed the issue and covered the repairs under warranty." (*Id.* ¶ 24).

In November 2022, Armstrong "observed that his dashboard indicated his vehicle as again low on engine coolant . . . ." (*Id.* ¶ 25).   Armstrong brought the vehicle to BMW of Buena Park who "diagnosed the issue as a coolant line failure" and "informed [] [him] [that] he would be required to pay for the necessary repairs because he was no longer within the warranty period . . . . (*Id.* ¶ 26).

In October 2022, Caldwell "purchased a certified pre-owned 2019 BMW 540i" from "BMW of Tampa," located in Tampa, Florida. (*Id.* ¶ 30). On March 15, 2023, Caldwell "observed that his dashboard indicated his vehicle was low on engine coolant." (*Id.* ¶ 36).   Caldwell filled the vehicle with engine coolant. (*Ibid.*).   "[T]wo days later," Caldwell "observed that his dashboard indicated his vehicle was again low on engine coolant" and once more "filled up his vehicle with coolant." (*Id.* ¶ 37).

---

[1] The following factual allegations are taken from the Amended Complaint that are accepted as true. *Sheridan v. NGK Metals Corp.,* 609 F.3d 239, 262 n.27 (3d Cir. 2010).

On March 20, 2023, Caldwell "observed that his dashboard indicated his vehicle was again low on engine coolant" and "noticed a coolant leak in both his garage and parking spot at work, and smelled an odor of coolant." (*Id.* ¶ 38). Caldwell "called BMW of Tampa regarding the coolant issues" and was "told to bring his vehicle in if he experienced the issue again." (*Ibid.*).

On April 20, 2023, Caldwell "brought his vehicle to BMW of Tampa" who "diagnosed the issue as a coolant line failure and noted that coolant line failure was a known issue in BMW vehicles." (*Id.* ¶ 39). "BMW of Tampa informed Caldwell" that "the coolant lines cannot withstand the heat they are subjected to during normal operation" and that "the necessary repairs would cost approximately $1,700." (*Id.* ¶ 40). Caldwell paid for the repairs. (*Ibid.*).

Caldwell "contact[ed] BMW's customer service division to request a goodwill reimbursement" and left several messages that were unreturned. (*Id.* ¶ 41). On September 28, 2023, Caldwell "provided Defendants with written notice of their violations of the Florida Deceptive and Unfair Trade Practices Act, as well as for their breaches of express and implied warranties." (*Id.* ¶ 42).

On June 18, 2024, the Court granted Defendant's motion to dismiss Plaintiffs' first amended class action complaint which alleged causes of action under: (i) California's state laws (Counts One to Three); (ii) breach of express and implied warranty (Counts Four to Five and Seven to Eight); (iii) Florida state law (Count Six); (iv) the Magnuson-Moss Warranty Act (Count Nine); and (v) common law fraud and unjust enrichment (Counts Ten to Eleven). (ECF Nos. 37, 38). The Court dismissed Plaintiff's First Amended Complaint in its entirety without prejudice and permitted Plaintiff to file an amended complaint no later than 30 days of the Order. (ECF No. 38).

On July 18, 2024, Plaintiffs filed the SCAC alleging the same causes of action. (ECF No. 39). On August 26, 2024, Defendant filed a motion to dismiss Plaintiffs' SCAC. ("Def.'s Br.")

(ECF No. 44, 44-1). On September 23, 2024, Plaintiffs opposed. ("Pls.' Br.") (ECF No. 46). Defendant replied. ("Def.'s Br.") (ECF No. 51). This matter is ripe for consideration.

## II.      LEGAL STANDARD

### A. Rule 12(b)(6)

Rule 8 requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief" and provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and internal quotations and ellipses omitted). On a Rule 12(b)(6) motion, the "facts alleged must be taken as true" and dismissal is not appropriate where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted). A complaint will survive a motion to dismiss if it provides a sufficient factual basis to state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a complaint is sufficient, the Third Circuit requires a three-part inquiry: (1) the court must first recite the elements that must be pled in order to state a claim; (2) the court must then determine which allegations in the complaint are merely conclusory and therefore need not be given an assumption of truth; and (3) the court must "assume the[] veracity" of well-pleaded factual allegations and ascertain whether they plausibly "give rise to an entitlement for relief." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (citations omitted).

### B. Rule 9(b)

Federal Rule of Civil Procedure 9(b) imposes additional pleading requirements. "Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller*

*Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002). Thus, pursuant to Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,* 812 F.3d 294, 307 (3d Cir. 2016). Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'" *Feingold v. Graff,* 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir. 2007)). This heightened standard is designed to "ensure that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

## III.    DISCUSSION[2]

### A. Plaintiffs Adequately Specify the Alleged Defect

As a threshold matter, the Court addresses whether Plaintiffs remedied the issues identified by the Court in its prior decision. The Court's prior opinion dismissed Plaintiffs' first class action complaint for failure to adequately allege a defect.[3] (ECF No. 37 at 6-7 ("[W]hile Plaintiffs allege

---

[2] The parties do not dispute that Plaintiffs' common law fraud, breach of warranty, and unjust enrichment claims are brought under California law. Thus, for purposes of this motion, the Court will apply California law to those claims and also follow the parties' lead in interchangeably referencing New Jersey law. *See Huber v. Taylor,* 469 F.3d 67, 74 (3d Cir. 2006) ("If there is no conflict, then the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply."); *Lamonaco v. CBS, Inc.,* No. 93-1975, 1993 WL 556536, at *2 (D.N.J. July 29, 1993), *aff'd,* 27 F.3d 557 (3d Cir. 1994) ("The Third Circuit has held that when the parties agree to apply the law of a particular state, and that state has an obvious interest in the litigation, a court need not examine the choice of law *sua sponte.*") (citation omitted).

[3] The Court also rejected Defendant's arguments that Plaintiffs' first class action complaint constituted impermissible "group pleading." (ECF No. 37 at 5-6.) To the extent Defendant again raises this issue, (*see* Def.'s Br. at 2 n.2, 16 n.8), the Court's prior reasoning remains. (*Id.* at 5 citing *McMahon v. Volkswagen Aktiengesellschaft,* No. 22-5137,

5

the symptoms of a defective coolant line (*i.e.*, leaking coolant), they fail to plausibly allege what is actually defective in the coolant line.")). Plaintiffs' SCAC now specifically alleges that "[t]he coolant lines in the Class Vehicles are defective because they prematurely wear at an accelerated rate due to both thermocycling and electrochemical degradation ([\"]ECD\"). (*See* Pls.' Br. at 3 (citing (SCAC ¶¶ 68-71)). Thus, the SCAC adequately identifies the specific defect alleged.[4] *See, e.g., DeCoteau*, 2015 WL 6951296 at *3 (plaintiffs "must allege the specific facts that plausibly support their belief in the existence of a defect for which defendant is responsible in order to give defendant sufficient notice to defend against their claims[,]" and "plausibly connect the existence of the alleged defect to the injuries they claim to have suffered.").

## B. Nationwide Claims

Plaintiffs assert breach of warranty, common law fraud, and unjust enrichment claims on behalf of themselves, the State classes, and also on behalf of a nationwide class. Defendant argues the Court should dismiss the nationwide class allegations because Plaintiffs lack standing to assert claims on behalf of putative classes under the laws of states where no named plaintiff is located. (Def.'s Br. at 34-35). In response, Plaintiff insists that a standing challenge is premature and more appropriately is a predominance issue to be decided at the class certification stage.

"[T]here is disagreement in this district over whether plaintiffs in a class action may assert claims under the laws of states where the complaint does not allege connections between the named plaintiffs and those states." *Rains v. Jaguar Land Rover N. Am., LLC*, No. 22-4370, 2023 WL 6234411, at *4 (D.N.J. Sept. 26, 2023) (quoting *Cohen v. Subaru of Am., Inc.*, No. 20-08442, 2022 WL 721307, at *6 (D.N.J. Mar. 10, 2022)). The Court agrees with the authority finding plaintiffs

---

2023 WL 4045156, *10 (D.N.J. June 16, 2023)); *see also Craft v. BMW of North America, LLC*, No. 24-06826, 2024 WL 5197080, at *3 (D.N.J. December 23, 2024).

[4] Defendant does not assert Plaintiffs new allegations are insufficient to allege a defect. (*See generally* Def.'s Br.; *see also* Pls.' Br. at 8).

must demonstrate standing for each claim they seek to assert. *See Craft*, 2024 WL 5197080, at *9 (dismissing nationwide claims for lack of standing); *Rains*, 2023 WL 6234411, at *4 (same); *Cohen*, 2022 WL 721307, at *6 (same); *Snowdy v. Mercedes-Benz USA, LLC*, No. 23-1681, 2024 WL 1366446, at *7 (D.N.J. Apr. 1, 2024) ("named Plaintiffs can only assert claims on behalf of individuals in states where at least one named Plaintiff has standing for that claim."); *Reinkraut v. FCA US LLC*, No. 23-02792, 2024 WL 4052986, at *9 (D.N.J. Sep. 5, 2024) (dismissing nationwide claims for lack of standing); *McGuire v. BMW of N. Am., LLC*, 13–7356, 2014 WL 2566132, at *6 (D.N.J. June 6, 2014) (recognizing split but agreeing that prior to class certification, named plaintiff must demonstrate standing to assert claims under the laws of the states in which he does not reside or suffered no injury); *see also Ponzio v. Mercedes-Benz, USA, LLC*, 447 F. Supp. 3d 194, 223 (D.N.J. 2020).[5] "The requirements for standing do not change because Plaintiffs fashion their claims in a purported nationwide class." *Tijerina v. Volkswagen Grp. of Am., Inc.*, No. 22-18755, 2023 WL 6890996, at *8 (D.N.J. Oct. 19, 2023) (citing *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 634 (3d Cir. 2017) ("The requirements for standing do not change in the class action context.")). Indeed, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."

---

[5] *But see Back2Health Chiropractic Ctr., LLC v. Sentinel Ins. Co., Ltd.*, No. 20-6717, 2021 WL 960875, at *6 (D.N.J. Mar. 15, 2021) ("Both *Mielo* and *Neale* lend support to Plaintiff's position – that as long as the named plaintiff has standing, it can bring claims on behalf of a nationwide class"); *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, No. 19-2875, 2022 WL 1013945, at *5 (D.N.J. Apr. 5, 2022) (agreeing with *Back2Health*). However, *Back2Health* and *In re Valsartan* read *Neale* and *Mielo* too broadly. *See Tijerina*, 2023 WL 6890996, at *8, n.3 (declining to "expand[ ] the holding in *Neale* to permit named class representatives who would not traditionally have Article III standing to bring claims on behalf of unnamed, putative class members who may have standing."); *Snowdy*, 2024 WL 1366446, at *6 (same). In *Neale*, the Third Circuit "squarely h[e]ld that unnamed, putative class members need not establish Article III standing" and that the "'cases or controversies' requirement is satisfied so long as a class representative has standing." *Neale*, 794 F.3d at 362. In *Mielo*, the court found plaintiffs had standing to seek relief beyond the Pennsylvania locations where they were injured, but plaintiff's claims there arose "under a violation of federal law which would not present the same issues regarding standing to assert various state-law claims." *Tijerina*, 2023 WL 6890996, at *8, n.2. Neither *Mielo* nor *Neale* held that "named plaintiffs can assert claims on behalf of putative class members which the named plaintiffs themselves do not have standing to bring." *Id.* at *8, n.2.

*Tijerina*, 2023 WL 6890996, at *8 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal

quotation marks omitted)). Otherwise, "a plaintiff would be able to bring a class action complaint

under the laws of nearly every state . . . without having to allege concrete, particularized injuries

relating to those states, thereby dragging defendants into expensive nationwide class discovery,

potentially without a good-faith basis." *Ponzio*, 447 F Supp. 3d at 223; *see also Craft*, 2024 WL

5197080, at *8 ("Allowing a named plaintiff in a putative action with no injuries in relation to the

laws of other states to assert the claims of proposed plaintiffs 'would allow named plaintiffs to

embark on lengthy class discovery with respect to injuries in potentially every state in the Union.'"

(quoting *McGuire*, 2014 WL 2566132, at *6). Therefore, Plaintiffs are limited to asserting claims

on behalf of individuals in states where at least one named Plaintiff has standing for a claim. *See,

e.g.*, *Craft*, 2024 WL 5197080, at *8; *Rose v. Ferrari North America, Inc.*, 2024 WL 1209185, at

*4 (D.N.J. March 20, 2024) (dismissing nationwide class allegations (citing *Tijerina*, 2023 WL

6890996, at *8; *Rains*, 2023 WL 6234411, at *4; *Cohen*, 2022 WL 721307, at *6; *Snowdy*, 2024

WL 1366446, at *7)).

### C. Magnuson-Moss Warranty Act (MMWA) [6]

In Count Nine, Plaintiffs allege a breach of written warranty under the Magnuson-Moss

Warranty Act, MMWA, 15 U.S.C. § 2310 *et seq.* Defendant argues for dismissal of Count Nine

because Plaintiffs fail to meet the jurisdictional requirements of the MMWA. (Def. Br. at 28). The

Court agrees.

The Third Circuit has explained that for purposes of establishing subject matter

jurisdiction, the MMWA requires that a claim identify 100 named plaintiffs. *Rowland v. Bissell*

---

[6] For clarity and completeness, the Court analyzes Plaintiffs MMWA claim. However, both Plaintiffs concede their MMWA claims in Count Nine. (*See* Pls.' Br. at 2 n.1). Thus, Count Nine is dismissed with prejudice.

*Homecare, Inc.*, 73 F.4th 177, 183 (3d Cir. 2023).[7] Here, Plaintiffs' SCAC identifies only two named Plaintiffs, well short of 100. Accordingly, Count Nine is dismissed without prejudice.

### D. California Fraud Claims

Consumer fraud claims, including those under California law, must meet the heightened pleading requirements of Rule 9(b). *Craft*, 2024 WL 5197080, at *4 (internal quotation and citation omitted). In Count One, Armstrong alleges a violation of California's Consumer Legal Remedies Act ("CLRA"), Cal Civ. Code § 1750 *et seq.* (SAC ¶¶ 119-131). In Count Two, Armstrong alleges a violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 (*Id.* ¶¶ 132-140.) In Count Three, Armstrong alleges a violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.* (*Id.* at ¶¶ 141-148). Defendant seeks to dismiss Armstrong's California common law and statutory fraud-based claims for failure to sufficiently plead the required elements of knowledge and reliance. (Def.'s Br. at 16-18). Defendant further argues that the FAL claim cannot proceed because no affirmative misrepresentation has been alleged. (*Id.* at 18-19).

### i.    Pre-sale Knowledge

For each of Plaintiffs' omission-based fraud claims, Plaintiffs must sufficiently plead that Defendant had pre-sale knowledge of the defect. *Romero v. Securus Techs., Inc.*, 216 F. Supp. 3d 1078, 1092 (S.D. Cal. 2016) (addressing common law fraudulent concealment claim); *Azoulai v. BMW of N. Am. LLC*, No. 16-589, 2017 WL 1354781, at *8 (N.D. Cal. Apr. 13, 2017) (quoting *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1025 (9th Cir. 2017)) (addressing CLRA and UCL claims).

---

[7] While this Court has jurisdiction pursuant to the CAFA, the Third Circuit has explicitly held that the CAFA cannot be used to otherwise create subject matter jurisdiction for MMWA claims. *Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 183 (3d Cir. 2023) ("CAFA does not provide a basis for federal jurisdiction over MMWA class actions that do not satisfy the MMWA's jurisdictional requirements.").

In the SCAC, Plaintiffs allege Defendant had pre-sale knowledge through: (1) BMWs pre-sale testing (¶¶ 78-86); (2) complaints submitted to National Highway Traffic Safety Administration ("NHTSA") and third-party websites (¶¶ 87-89); (3) a technical service bulletin (¶¶ 90-99); and (4) prior litigation related to defective engine coolant systems (¶¶ 100-102). The Court addresses each alleged basis, in turn.

First, Plaintiffs allege that BMW's pre-production durability testing was sufficient to alert it to the coolant line defect. (Pls.' Br. at 14). Defendant asserts Plaintiffs pre-production testing is too broad. (Def.'s Br. at 14-15). The Court agrees with Defendants.

Plaintiffs' pre-production testing allegations are excessively broad and largely unrelated to the alleged defect. (SCAC ¶¶ 78-86). For example, a majority of Plaintiffs testing allegations refer to information taken from BMW's website, which merely includes language best described as marketing rather than concrete statements inferring BMW implemented testing that would alert them to a coolant line defect. (*Id.* at ¶¶ 78-80 "BMW pioneers new technologies;" "BMW driving experience . . . describes the essence of the brand, which is very robust, resilient and future-oriented;" "[d]esigners have to understand far in advance what will be regarded as modern and cutting-edge in tomorrow's world . . . ."). Other testing allegations are merely conclusory. (*Id.* at ¶¶ 82, 86 "BMW knows that its customers expect the service life of their vehicles to last and crucial components central to the safety and functionality of the vehicle are not expected to fail in the first few years of ownership;" "Through their quality control measures, Defendants knew or should have known of the Defect.").

Even construing the testing allegations in a light most favorable to Plaintiffs, the most technical portions of the pre-testing allegations still do not demonstrate BMW's testing would have provided pre-sale knowledge of the coolant line defect. (*Id.* at ¶¶ 81-83), "state-of-the-art digital

technolog[y] . . . computer-aided styling;" a statement from an engineering manager that "lightweight construction, optimal use of materials, quality assurance and many other factors have significantly increased the requirements for engineering strength[,]" and that BMW utilizes a "vehicle load analysis vehicle" known as FABEAN which "allow[s] maximum vehicle loads to be determined at a very early stage" and to simulate "the stresses that arise during a journey, and in addition verifies the calculated load forecasts.") As such, the SCAC testing allegations lack specificity that could plausibly infer the coolant lines defect would have been identified. *Compare Craft*, 2024 WL 5197080, at *4 (finding analogous and in some cases exact pre-sale testing allegations insufficient to infer BMWs pre-sale knowledge); *Lozano v. Nissan North America, Inc.*, 2023 WL 2628691, at *3 (C.D. Cal. Feb. 21, 2023) (plaintiff failed to plead defendant's knowledge of defect because "[t]he majority of Plaintiff's pre-sale knowledge allegations [including "pre-production testing" and "design failure mode and analysis data"] are conclusory or generalized") [8]; *Hardt v. Chrysler Grp. LLC*, 2015 WL 12683963, at *4 (C.D. Cal. Mar. 16, 2015) ("In cases where the plaintiffs fail to allege how 'pre-release testing data' or 'aggregate data' could have alerted the manufacturer to the alleged defect, courts have treated generalized allegations regarding the existence of such testing or information as insufficient to establish knowledge."); *Grodzitsky v. American Honda Motor Co., Inc.* ("*Grodzitsky I*"), 2013 WL 690822, at *6 (C.D. Cal. Feb. 19, 2013) (same); *Wong v. Am. Honda Motor Co.*, No. 19-10537, 2022 WL 3696616, at *10 (C.D. Cal. June 21, 2022) ("[T]he mere fact that Honda typically conducts testing is insufficient to plausibly allege it had pre-sale knowledge of the defect."); *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1147 (9th Cir. 2012) (agreeing knowledge of defect not sufficiently

---

[8] Plaintiffs attempt to distinguish their testing allegations from the "single paragraph allegations in *Lozano* and *Hardt*" (Pls.' Br. at 16). However, the Court's finding that Plaintiffs' testing allegations insufficient is based on the lack specificity that the testing was designed to reveal the alleged defect rather than length.

pled where manufacturer's alleged access to information regarding risk of overheating was speculative and did not "suggest how any tests or information could have alerted [the manufacturer] to the defect."); *Cho v. Hyundai Motor Co., Ltd.*, 636 F. Supp. 3d 1149, 1171 (C.D. Cal. 2022) (finding claim that pre-sale exhaust emissions system's durability testing would have revealed oil consumption defect was conclusory and insufficient to imply knowledge); *Resnick v. Hyundai Motor Am., Inc.*, No. 16-00593, 2016 WL 9455016, at *13 (C.D. Cal. Nov. 14, 2016) (finding allegations of defendants' presale knowledge of product defect based on testing was insufficient where plaintiffs' allegations were purely speculative and failed to establish when any testing occurred, stating that defendant "likely" performed testing); *Burdt v. Whirlpool Corp.*, No. 15-01563, 2015 WL 4647929, at *4 (N.D. Cal. Aug. 5, 2015) ("Plaintiff must allege more than an undetailed assertion that the testing must have revealed the alleged defect. Otherwise, any consumer could bring a CLRA claim merely by asserting that a manufacturer had knowledge of an alleged defect from its prerelease testing."), *with Kimball v. Volkswagen Grp. Of Am., Inc.*, No. 22-4163, 2024 WL 4038171, at *6 (D.N.J. September 3, 2024) (Plaintiff alleges Defendant had pre-sale knowledge through pre-production testing and post-production monitoring . . . Plaintiff asserts the testing was designed to reveal the alleged turbocharger defect, that such defect was revealed, and discovery will confirm the defect and/or its causes . . . These allegations establish pre-sale knowledge."); *Bullard v. Jaguar Land Rover Auto. PLC*, No. 20-14464, 2023 WL 4845873, at *6 (D.N.J. July 28, 2023) ("Plaintiffs allege that Defendants completed certain tests designed to expose defects like the Turbocharger Defect, that such defect was in fact exposed, and that 'discovery is expected to confirm' that the testing results showed 'material stress, fissures, cracks and breaks and/or outright failure of the Turbocharger' . . . The allegations that Defendants conducted testing which was designed to show, and did in fact show, that the turbocharger was

defective creates a reasonable inference that Defendants knew of the Turbocharger Defect pre-sale."); *Ponzio*, 447 F Supp. 3d at 228 (discussing detailed paint test procedures alleged in the complaint and noting "it provides enough facts to infer that the defect complained of would have arose in the testing processes Mercedes allegedly conducts.").

Second, Plaintiffs offer thirty-one (31) consumer complaints—consistent with the alleged defect—submitted to NHTSA, which BMW, like all automobile manufacturers, are legally obligated to routinely monitor. (Pls.' Br. at 10-11 (citing SCAC ¶ 88)). Defendant asserts that all but one of the consumer complaints were made after Armstrong's purchase,[9] less than one third of the complaints pre-date Caldwell's purchase, and none referenced Plaintiffs' series 5 vehicle models. (Def.'s Br. at 11, 12-13).

For the NHTSA consumer complaints submitted *after* Armstrong and Caldwell's purchases, case law instructs these consumer complaints insufficient to establish prior knowledge of the alleged defect. *See David v. Volkswagen Group of Am., Inc.*, 2018 WL 1960447, at *7 (D.N.J. April 26, 2018) ("Plaintiff's allegations that Defendant was on notice of defects because of consumer complaints, a letter to [NHTSA], and a recall of the Volkswagen Beetle . . . fail to support his claim because these events do not involve the 2014 Touareg and/or occurred after Plaintiff made his purchase."); *Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 2012 WL 1574301, at *18 (D.N.J. May 3, 2012) (insufficient knowledge allegations where NHTSA complaints were filed after plaintiff purchased vehicle at issue).

However, the NHTSA consumer complaints that pre-date Caldwell's purchase are consistent with the alleged defect. (*See generally* SCAC ¶ 89). Notwithstanding that none of these

---

[9] The one consumer complaint that does pre-date Armstrong's purchase occurred only four days prior to his purchase. (Def.'s Br. at 4 (citing SCAC ¶ 89). For purposes of this motion, the Court finds the one complaint made four days prior to Armstrong's purchase insufficient to establish pre-sale knowledge.

complaints reference a series 5 vehicle, Plaintiffs allege the same cooling line defect in all Class Vehicles, which includes 2, 3, 4, as well as 5 series vehicles. (SCAC ¶ 2). Taking that allegation as true, the NHTSA complaints make Defendant's pre-sale knowledge of the cooling line defect plausible. *Craft*, 2024 WL 5197080, at *4.

Plaintiffs also allege the Internet "is replete with examples of blogs and other websites where consumers have complained of the exact same [d]efect in the Class Vehicles." (SCAC ¶ 87). To the extent these Internet posts pre-date Plaintiffs' purchases they further support the plausibility of Defendant's pre-sale knowledge.[10] *See Afzal v. BMW of N. Am., LLC*, No. 15-8009, 2017 WL 3207232, at *5 (D.N.J. July 27, 2017) (rejecting defendant's claim that it lacked knowledge because of "too few" complaints where internet posts identified specific defect); *cf. Block v. Jaguar Land Rover N. Am., LLC*, No. 15-5957, 2017 WL 902860, at *7-8 (D.N.J. Mar. 7, 2017) (rejecting knowledge allegations based on ten consumer complaints posted on various websites where none of the complaints pre-dated a technical service bulletin and none identified the particular defect at issue).

Third, Plaintiffs assert BMW had pre-sale knowledge based on a technical service bulletin ("TSB") issued in February 2022. (Pls.' Br. at 11-13). Defendant argues that "case law is clear: service bulletins . . . should not be used as evidence of knowledge of an alleged defect" because

---

[10] Plaintiffs note that in the Internet posts users reported that they notified BMW's authorized dealerships of the issue. (Pls.' Br. at 11 n.2). Defendant notes cases in which courts have found consumer complaints on third-party websites insufficient to infer pre-sale knowledge, (Def.'s Rep. Br. at 2 n.2), however, those cases are instances in which pre-sale knowledge could not be inferred where there were no allegations the manufacturer saw such complaints. (*Id.* (citing *Granillo v. FCA US LLC*, 2016 WL 9405772, at *23-24 (D.N.J. Aug. 26, 2016) ("Courts in this district have repeatedly found that consumer complaints on third-party websites are not sufficient to infer a manufacturer's knowledge of a product defect where there are no allegations that the manufacturer saw such complaints.") (collecting cases); *Rait v. Sears, Roebuck and Co.*, 2009 WL 2488155, at *4 (D.N.J. Aug. 11, 2009) ("This Court agrees with Sears that if Ms. Rait's position is accepted that virtually every consumer product company would be subject to fraud claims and extensive discovery. All any plaintiff would be required to show is that a product broke once and that someone had complained about it on the internet."). However, here, Plaintiffs allege that in these online consumer complaints authorized dealerships were notified of the coolant line issue. Thus, the Court finds such a variation relevant and distinct from otherwise unknown, fortuitous posts of which Defendant would have no knowledge of.

"[a]ccepting these advisories as a basis for consumer fraud claims may discourage manufacturers from responding to their customers in the first place." (Def.'s Br. at 11 (quoting *Alban v. BMW of North America, LLC*, 2011 WL 900114, at \*25 (D.N.J. March 15, 2011)). Defendant further argues that the TSB was issued subsequent to Armstrong's purchase in 2020 and while the TSB pre-dates Caldwell's purchase, it does not apply to series 5 vehicles. (Def.'s Br. at 12). The Court agrees with Plaintiffs.

As Plaintiffs point out, Defendant misconstrues the purpose of the TSB at the motion to dismiss stage. "While service bulletins should not be used as potential admissions of liability or defect, they may be used to show knowledge of a defect." *Craft*, 2024 WL 5197080, at \*4. Plaintiffs' reliance in part on the TSB is only to plausibly allege BMW's pre-sale knowledge, not assign liability or admit any defect. *See Ponzio*, 447 F. Supp. 3d at 229 ("At this juncture, the Court is not determining liability or considering the TSB as an 'admission' of any kind. Rather, the various 'TSB helps render plausible Plaintiffs' allegations that Defendants knew of the alleged defect.") (citing *Skeen v. BMW of N. Am., LLC*, No. 13-1531, 2014 WL 283628, at \*10 (D.N.J. Jan. 24, 2014); *see also Am. Honda v. Super. Ct.*, 132 Cal. Rptr. 3d 91, 100 (2011).

Although the February 2022 TSB cannot be used to demonstrate pre-sale knowledge as it relates to Armstrong since his purchase occurred in 2020, the TSB establishes pre-sale knowledge for Caldwell's purchase. The February 2022 TSB states that "the coolant line cannot handle excessive high temperatures over the lifetime of the part." (SCAC ¶ 95). The Court finds unpersuasive Defendant's assertion that because the TSB only applied to 2, 3, and 4 series vehicles it cannot demonstrate BMW's pre-sale knowledge. (Def.'s Br. at 12). First, Plaintiffs allege that the same cooling line defect exists in *all* Class Vehicles, which includes 2, 3, 4, as well as 5 series vehicles. (SCAC ¶ 2). Indeed, the TSB may squarely relate to the vehicles of other class members.

Additionally, logic dictates that a TSB issued in response to the same defect in various other models adequately imparts pre-sale knowledge as it relates to Plaintiffs series 5 vehicles. *In re Subaru Battery Drain Prod. Liab. Litig.*, No. 1:20-03095, 2021 WL 1207791, at *23 (D.N.J. Mar. 31, 2021) (finding that although technical service bulletins did not involve same year and model as class vehicles, where plaintiffs alleged defective electrical system had "been implemented in all Subaru models," knowledge of problems in non-class vehicles could show defendants knew same problems affected class vehicles with same electrical system). Defendant contends that absent allegations explaining how "a defect in another vehicle model connects to the alleged" defect in Plaintiffs' vehicles, their allegations are insufficient to show pre-sale knowledge." (Def's Br. 12) (quotation and citation omitted). However, the connection between the alleged defect in the vehicles delineated in the TSB and the Class Vehicles is axiomatic—all the Class Vehicles—which include 2, 3, 4, and 5 series vehicles—utilize the same allegedly defective coolant lines.[11] (SCAC ¶¶ 2, 23, 26, 28, 39, 58-76). Thus, pre-sale knowledge could be imparted to BMW related to 5 series vehicles since the TSB addressed a coolant line defect. *Craft*, 2024 WL 5197080, at *4 ("Although the only complaint that mentions "water intrusion" in the rear antennae does not pertain to an X-5, and likewise, the SIB only applies to BMW X3, X5, X7 Sports Activity Vehicles

---

[11] To the extent Defendant might contend Plaintiffs lack standing to assert claims based on vehicles they did not own or lease, dismissal on such grounds would be premature. The named plaintiffs may satisfy the threshold standing issue for claims related to products they did not own or lease if they satisfy the factors enumerated by the Third Circuit in *Haas v. Pittsburgh National Bank*, 526 F.2d 1083, 1088-89 (3d Cir. 1975). *See Kavon v. BMW of North America LLC*, 605 F. Supp. 3d 622 (D.N.J. 2022). "Under the *Haas* test, a plaintiff may have standing 'to assert claims on behalf of putative class members regarding products they did not personally purchase where (1) the basis of the claims is the same, (2) the products are closely related, and (3) the claims are against the same defendants.'" *Id.* at 630 (quoting *Cannon v. Ashburn Corp.*, No. 16-1452, 2016 WL 7130913, at *4 (D.N.J. Dec. 7, 2016) (citations omitted)). "The *Haas* test is sufficient to satisfy the minimum threshold requirement of standing and comports with the overall goals of representative litigation." *Kavon*, 605 F. Supp. 3d at 630. First, all Class Vehicles share the same factual basis: The coolant lines in the Class Vehicles are defective because they prematurely wear at an accelerated rate due to both thermocycling and electrochemical degradation ("ECD"). (SCAC ¶¶ 68-71). Second, Class Vehicles are all BMWs with the coolant line defect, such that the Class Vehicles are all closely related. (*Id.*; *see also id.* at ¶ 1). Third, Plaintiffs assert their claims against same Defendant(s), BMW. Consequently, the Court finds Plaintiffs have standing to bring claims on behalf of purchasers of all Class Vehicles. However, at the class certification stage, Plaintiffs have the burden of proving that the case is appropriately brought as a class action. *Kavon*, 605 F. Supp. 3d at 631.

and X4, X6 Sports Activity Coupes, Plaintiff alleges that the same Sealing Defect exists in *all* Class Vehicles.") (emphasis in the original).

Fourth, Plaintiffs assert that prior class action litigation against BMW in *Oliver v. BMW of North America LLC* related to a failure of the coolant system in 2008-2019 BMW vehicles further establishes its knowledge of the Defect. (Pls.' Br. at 16). Defendant counters that Plaintiffs cannot rely on the class-action settlement in *Oliver* because *Oliver* related to a different part–the coolant pump, not the coolant line—in entirely different vehicles. (Def.'s Br. at 14).[12]

In short, although every allegation does not support an inference of pre-sale knowledge, the totality of allegations construed in Plaintiffs' favor are sufficient to render the claim of pre-sale knowledge plausible. *Craft*, 2024 WL 5197080, at *4; *Afzal*, 2017 WL 3207232, at *6; *Ponzio*, 447 F. Supp. 3d at 229 ("Plaintiffs allegations pertaining to consumer complaints should be considered together with the rest of allegations of presale knowledge"); *In re Subaru Battery*, 2021 WL 1207791, at *23 ("Taken together and construed in favor of Plaintiffs, the facts and evidence which Plaintiffs cite in the Consolidated Complaint permit a plausible inference that Defendants knew of the Battery Defect when they sold vehicles to Plaintiffs."); *Pinon v. Daimler AG*, No. 18-3984, 2019 WL 11648560, at *24 (N.D. Ga. Nov. 4, 2019) (holding "although each individual piece of information that Plaintiffs rely upon may not, standing alone, demonstrate that Defendants knew of the issues . . . before Plaintiffs purchased their vehicles, the Court finds that they do so collectively."); *see also Kavon*, 605 F. Supp. 3d at 643 ("BMW is in exclusive control of most of

---

[12] Defendant relies on *Salcedo v. Nissan N. Am., Inc.*, 2023 WL 332761, at *7 (C.D. Cal. Jan. 18, 2023) in support of the proposition that Plaintiffs can not rely on a prior class action settlement. However, the *Salcedo* Court does not address a prior class action settlement, but rather discusses how a TSB related to different vehicles, coupled with plaintiff's failure to state when Nissan was given notice of the TSB, failed to support pre-sale knowledge. *See Salcedo*, 2023 WL 332761, at *7-8. While this *Salcedo* reasoning is relevant to the February 2022 TSB here, it does not squarely address a prior settlement and thus, inapposite.

the information that would establish when it first became aware of the alleged defect, and the surrounding circumstances as alleged in the 2AC are sufficiently suggestive.").

### ii.    Reliance

Defendant next argues for dismissal of Armstrong's fraud-based claims under CLRA, UCL, and FAL for failure to plead reliance. (Def.'s Br. at 16-18).

Armstrong need only allege that the omission was a substantial factor in their decision by showing first "that, had the omitted information been disclosed, one would have been aware of it" and second, he would have "behaved differently." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (citing *Mirkin v. Wasserman*, 23 Cal. Rptr. 2d 101, 107 (1993)).

The first prong does not require Armstrong to plead that he actually viewed a specific advertisement. *See Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 967 (N.D. Cal. 2018). Rather, omissions cases are "premised on the defendant's affirmative duty to disclose" and plaintiffs "must simply 'establish a plausible method of disclosure and . . . that they would have been aware of information disclosed using that method.'" *Id.* (citing *Daniel*, 806 F.3d at 1226). The "'proper focus . . . is . . . what channels of information customers depend upon and whether the defendant could have taken action to disseminate information through those channels[.]'" *Id.* (citing *Sloan v. General Motors LLC*, 287 F. Supp. 3d 840, 875, 2018 WL 784049, at *21 (N.D. Cal. 2018)).

Here, Armstrong claims that prior to purchase he discussed the features with BMW's sales representatives at the dealership and also reviewed the window sticker and that neither of those sources disclosed the alleged defect. (SCAC ¶¶ 20, 22). That is sufficient to show that Armstrong would have been aware of the disclosure had Defendant disclosed the coolant line defect to its authorized dealerships. *See, e.g.*, *Daniel*, 806 F.3d at 1226 (finding that although plaintiffs did not view any advertising materials produced by Ford prior to purchase, plaintiffs' interaction with and

receipt of information from sales representatives at authorized Ford dealerships was "sufficient to sustain a factual finding that Plaintiffs would have been aware of the disclosure if it had been made through Ford's authorized dealerships"); *Baranco*, 294 F. Supp. 3d at 968 (drawing inference that plaintiff "could have received such information had Ford publicized the defect through the dealer, as it is highly improbable that she purchased her vehicle from a dealership without any exchange of information whatsoever (or at least an opportunity for such an exchange).").

Armstrong's allegations also satisfy the second prong. "That one would have behaved differently can be presumed, or at least inferred, when the omission is material." *Daniel*, 806 F.3d at 1225 (citation omitted). "Alleged defects that create 'unreasonable safety risks' are considered material." *Id.* (concluding it can be presumed that nondisclosure of safety risk impacted purchase decision). Because Plaintiff alleges that the coolant line defect poses a "substantial safety threat," *see, e.g.,* (SCAC ¶ 58), it can plausibly be inferred that had the coolant line defect been disclosed through the window sticker or sales representatives, Plaintiff "would not have purchased his vehicle, or would have paid less for it." (*Id.* at ¶ 30).

Accordingly, Defendant's motion to dismiss the statutory and California common law fraud claims in Counts One, Two, and Ten for failure to plead knowledge or reliance is denied.

### iii.    Affirmative Misrepresentation (FAL Claim)

Under the FAL, it is unlawful for any person "to make or disseminate or cause to be made or disseminated before the public . . . any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500. A majority of California Courts have held that there can be no FAL claim on pure omission where there is no "statement" at all, that is, a plaintiff has not alleged any actual misleading or untrue statements. *See, e.g., Ponzio*, 447 F. Supp. 3d at 248

(citing *Norcia v. Samsung Telecommunications Am., LLC*, No. 14-00582, 2015 WL 4967247, at *8 (N.D. Cal. Aug. 20, 2015) (collecting cases)); *Dana v. Hershey Co.*, 180 F. Supp. 3d 652, 669 (N.D. Cal. 2016), *aff'd*, 730 F. App'x 460 (9th Cir. 2018) (dismissing FAL claim based on pure omissions where plaintiff alleged failure to disclose on Hershey chocolate packaging that some cocoa originated at farms that use slave labor). "When a FAL claim is predicated on a theory of omission, a plaintiff must identify an actual affirmative statement by defendant that was made false by the omission of some material fact." *Craft*, 2024 WL 5197080, at *5 (citing *Stewart v. Electrolux Home Prod., Inc.*, 304 F. Supp. 3d 894, 908 (E.D. Cal. 2018).[13] In this case, as Armstrong has not identified any statement regarding coolant lines purportedly rendered false or misleading due to an omission of a material fact, the FAL claim is dismissed without prejudice.

### E. Florida Fraud Claims

#### i.    Common Law Fraud

Defendant moves to dismiss Caldwell's common law fraud claim because under Florida law such a claim requires a misrepresentation. (Def.'s Br. at 19). Plaintiff counters that a Florida common law fraud claim may be based on an omission. (Pls.' Br. at 21). The Court agrees with Plaintiffs.

Florida jurisprudence recognizes omission-based fraud. *See, e.g.*, *Broadway Gate Master Fund, Ltd. v. Ocwen Fin. Corp.*, No. 16-80056, 2016 WL 9413421, at *3 (S.D. Fla. June 29, 2016) ("The elements of Florida common law fraud are that: (1) the defendant made a false statement or omission of material fact . . . ."); *In re Palm Beach Fin. Partners, L.P.*, 517 B.R. 310, 334-35) (Bankr. S.D. Fla. 2013) ("Fraud by omission is common law fraud by means of a failure to disclose

---

[13] Plaintiffs cite to *Tait v. BSH Home Appliances Corp.*, No. 10-cv-00711, 2011 WL 3941387, at *3 (C.D. Cal. Aug. 31, 2011) as an example of a court holding "affirmative misrepresentations are not required to pursue [p]laintiff's FAL claim." (Pls.' Br. at 20). However, a review of the *Tait* Court's decision reveals no such quotation or holding. *See Tait*, 2011 WL 3941387, at *3.

a material fact—rather than by means of an affirmative misrepresentation—in the face of [] a duty to disclose that fact to the plaintiff."); *Med-Stop, Inc. v. Vandutch, Inc.*, No. 23-21875, 2025 WL 26731, at *6 n.5 ("Florida law recognizes that fraud can occur by omission") (citation omitted). At this juncture, the Court will not dismiss Caldwell's common law fraud claim on this basis; accordingly, Count Ten survives under Florida law.

### ii.    Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*

Defendant argues that Caldwell's causation allegations are conclusory and insufficient to sustain his FDUTPA claim. (Def.'s Br. at 20). Plaintiff argues to the contrary. (Pls.' Br. at 21-22). The Court agrees with Caldwell.

While a FDUTPA claim is not necessarily a fraud claim, and thus, not always subject to the heightened pleading standard of Rule 9(b), Caldwell's FDUTPA claim does sound in fraud, consequently, the Court will apply the heightened pleading standard. *See, e.g.*, *Morano v. BMW of N. Am., LLC*, 928 F. Supp. 2d 826, 833 (D.N.J. 2013) (collecting cases and applying heightened Rule 9(b) standard to a FDUTPA sounding in fraud).

To establish a FDUPTA violation, a plaintiff must prove three elements: (1) "a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985-86 (11th Cir. 2016); *see also Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 340 (D.N.J. 2014) (citation omitted). Courts use an objective test to determine whether an act is deceptive under FDUTPA, and the plaintiff must show that "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances." *Carriuolo*, 823 F.3d at 983-84 (quoting *State, Office of the Att'y Gen. v. Com. Com. Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. Dist. Ct. App. 2007)). "A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *Id.* at 984 (quoting *Davis v. Powertel, Inc.*,

776 So. 2d 971, 973 (Fla. Dist. Ct. App. 2000)); *see also Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1311 (11th Cir. 2023).

To establish an unfair practice, the plaintiff must show that it is one that "offends established public policy" and one that is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (quoting *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 489 (Fla. Dist. Ct. App. 2001)). Under the FDUTPA, actual damages "are measured according to 'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'" *Carriuolo*, 823 F.3d at 986 (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984)). A plaintiff, however, cannot state a cause of action under FDUTPA if the consumer fails to plead that they suffered actual damages. *Macias v. HBC of Florida, Inc.*, 694 So. 2d 88, 90 (Fla. Dist. Ct. App. 1997) (holding that plaintiff failed to state a cause of action under FDUTPA as she suffered no actual damages and affirming dismissal of complaint with prejudice).

"[T]he Florida Supreme Court teaches that a deceptive act occurs when there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Gavron v. Weather Shield Mfg., Inc.*, 819 F. Supp. 2d 1297, 1302 (S.D. Fla. 2011) (cleaned up). Caldwell alleges that Defendant omitted the existence of the purported coolant line defect. (SCAC ¶ 44).

As Florida courts have noted, the causation element requires "that an objective[ly] reasonable person would have been deceived." *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir.2011). Caldwell, on behalf of himself and the Florida class, adequately pleads

causation—but for Defendant's omission regarding the alleged coolant line defect "he would not have purchased his vehicle, or would have paid less for it." (SCAC ¶ 44). (*See* Def.'s Rep. Br. at 7 (citing *Hennegan Co. v. Arriola*, 855 F. Supp. 2d 1354, 1361 (S.D. Fla. 2012) (without evidence that plaintiff would not have been injured but for defendant's acts, plaintiff "has failed to present sufficient evidence of causation . . . to prove a claim under FDUTPA.")).

Caldwell suffered actual damages; he paid approximately $1,700 to replace the coolant line in his vehicle. (SCAC ¶ 40). Additionally, at this stage, Caldwell claims actual damages based on "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Carriuolo*, 823 F.3d at 986.

At this juncture, these allegations plausibly allege a FDUTPA claim. *See In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.*, 955 F. Supp. 2d 1311, 1333 (S.D. Fla. 2013) ("Plaintiffs' allegations . . . that they would not have purchased the products but for WhiteWave's misrepresentations, . . . that they were damaged in the amount of the difference between the premium price paid for the DHA-fortified milk products and the price they would have paid for other milk products are sufficient to allege causation and damages under the FDUTPA."); *Harris v. Nordyne, LLC*, No. 14-21884, 2014 WL 12516076, at *7 (S.D. Fla. Nov. 14, 2014) ("Plaintiffs allege that when class members bought their HVAC systems, they reasonably believed that they would function as intended; that Defendant concealed the corrosion defect that preluded that functionality; and that, had the class members known about the defect, they would not have purchased or would have paid less for the systems. A FDUTPA claim is properly stated under those conditions."); *Matthews v. Am. Honda Motor Co.*, No. 12-60630, 2012 WL 2520675, at *3 (S.D. Fla. June 6, 2012) ("Florida courts have recognized that a FDUTPA

claim is stated where the defendant knowingly fails to disclose a material defect that diminishes a product's value.").

### F. Warranty Claims

#### i. Express Warranty[14]

Defendant asserts that the express warranty claim on Armstrong's pre-owned 2017 vehicle fails because the only repairs not covered by his warranty occurred after the warranty period. (Def.'s Br. at 23). Armstrong retorts that he initially sought repairs during the warranty period, but those repairs failed to remedy the coolant line defect, necessitating him to seek additional repairs twice, and that those subsequent repairs properly state a claim for breach of express warranty. (Pls.' Br. at 23-24). The Court agrees with Plaintiffs.

"To state a claim for breach of express warranty under California law, a plaintiff must allege (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of warranty which proximately caused plaintiff's injury." *T & M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 875 (N.D. Cal. 2015) (citations omitted).

The "New Vehicle Limited Warranty" ("NVLW") for the Class Vehicles offers a 4-year/50,000-mile warranty, which states "BMW of North America, LLC (BMW NA) warrants during the Warranty Period the 2017 U.S.- specification BMW vehicles distributed by BMW NA or sold through the BMW NA European Delivery Program against defects in materials or workmanship to the first retail purchaser, and each subsequent purchaser." (SCAC ¶ 104, (citing Ex. 3 at 2, ECF No. 39-3)).

---

[14] The Court notes that Caldwell does not allege his vehicle was under warranty when the coolant line defect manifested or when his vehicle underwent repairs. (*See, generally* SCAC). Thus, having failed to allege a valid warranty, the Court does not address any claim for breach of express warranty as to Caldwell.

The first engine coolant repair sought by Armstrong—less than a year after purchase—was within the warranty period and covered by BMW. (SCAC ¶¶ 23-24).[15] Thereafter, Armstrong's vehicle leaked engine coolant twice more, necessitating two additional repairs, which occurred after the expiration of the warranty and cost Armstrong $2,000 each. (SCAC ¶¶ 25-28).

Defendant underscores that "the 'general rule' is [] 'a plaintiff may not bring a claim for breach of an express warranty where a defect has not manifested during the warranty period'" and that the Third and Ninth Circuits have adopted the rationale that "latent defects discovered after the term of the warranty are not actionable." (Def.'s Br. at 23; Def.'s Rep. Br. at 9-10); *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 616 (3d Cir. 1995) (alteration in original) ("an express warranty does not cover repairs made after the applicable time . . . ha[s] elapsed.") (quoting *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d Cir. 1986)); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (same).

However, Armstrong's first coolant leak did occur *during* the express warranty period. (SCAC ¶ 24).[16] Thus, Armstrong's vehicle, which manifested the same precise issue—a coolant leak—on two additional occasions *after first occurring while covered under warranty* is congruent with *Duquesne Light Co.* and *Clemens'* rationale and does not preclude his express warranty claim. *See Duquesne Light Co.*, 66 F.3d at 616 ("[L]atent defects discovered after the term of the warranty are not actionable.") (quotation omitted); *Clemens*, 534 F.3d at 1023 ("The repairs in this case were made after the warranty period expired. Therefore, we affirm the dismissal of the express warranty claims."). *Accord Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 519 (D.N.J. 2008) ("In

---

[15] Repairs made under BMW's warranty do not extend the NVLW. (Def.'s Rep. Br. at 8-9 (citing Declaration of Christopher J. Dalton ("Dalton Decl.") Ex. B at 2, ECF No. 44-4)).

[16] At the time of the first repair, Armstrong's vehicle had approximately 35,000 miles.

the case at bar, Plaintiffs . . . allege that the defects in their vehicles manifested outside the warranty period.").[17]

"Whether [BMW] met the terms of the express warranty by providing 'repairs,' but not actually fixing the alleged defects, cannot be determined at this motion to dismiss stage, where plaintiffs' claims must be accepted as true." *Wesley v. Samsung Elecs. Am., Inc.*, No. 20-18629, 2024 WL 3272263, at *6 (D.N.J. June 30, 2024) (quoting *Kuzian v. Electrolux Home Prod., Inc.*, 937 F. Supp. 2d 599, 611 (D.N.J. 2013) and citing *Simner v. LG Elecs. U.S.A., Inc.*, 2022 WL 3152707, at *8 (D.N.J. Aug. 8, 2022) (upholding breach of warranty claim where the manufacturer performed one ineffective repair)); *see also Bang v. BMW of N. Am., LLC*, No. 15-6945, 2016 WL 7042071, at *7 (D.N.J. Dec. 1, 2016). Accordingly, Armstrong's express warranty claim survives.[18]

### i.    Song-Beverly Act ("SBA") Claims[19]

Defendant moves to dismiss Armstrong's express warranty claim under the SBA for the same reason as Armstrong's common law express warranty claim—the repairs occurred after the warranty period. (Def.'s Br. at 24). Armstrong opposes and contends the claim is adequately plead. (Pls.' Br. at 29-30). The Court agrees with Armstrong.

---

[17] Defendant argues that Plaintiffs' reliance on *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1178 (C.D. Cal. 2010) is misplaced and actually supports Defendant's position. (Def.'s Rep. Br. at 8). Defendant contends "Plaintiffs here do not make broad-based defect allegations like the plaintiffs there—that all repairs or attempted repairs related to the alleged defect are flawed. Instead, only Armstrong claims his (warranty) repair was ineffective" and "that the *In re Toyota* [C]ourt found that individuals who did not seek repair during the warranty period could not make a claim for breach of warranty . . . ." (*Id.*). However, Armstrong does allege the first repair covered under warranty was flawed by nature of his need for two additional repairs—presumed to be "flawed" given the need for multiple repairs of the same coolant leak issue and Armstrong did seek repair during the warranty period. (SCAC ¶¶ 23-28).

[18] For clarity, the Court understands Plaintiffs alleged coolant line defect to be related to materials and workmanship, not a design defect, which is not covered by BMW. *See, Coba v. Ford Motor Co.*, 932 F.3d 114, 123–24 (3d Cir. 2019) ("[U]nder New Jersey law, a warranty that limits its coverage to defects in 'materials' and 'workmanship' does not, without more, apply to defects in 'design.'"); *Tijerina*, 2023 WL 6890996, at *15 (same).

[19] Armstrong concedes his implied warranty claim under the Song-Beverly Act. (*See* Pls.' Br. at 2 n.1). Thus, Count Five is dismissed with prejudice.

Under the SBA, "[a]ny buyer of consumer goods who is damaged by a failure to comply with any obligation . . . under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief." Cal. Civ. Code § 1794(a). The SBA is a remedial statute designed to protect consumers who have purchased products covered by an express warranty. *Ruvalcaba v. Hyundai Motor Am.*, 22-01244, 2024 WL 943946, at *2 (C.D. Cal. Jan. 4, 2024). The Act regulates warranty terms and imposes repair and service obligations on the parties issuing the warranties. *Id.* To state a breach of express warranty claim under the SBA, a plaintiff must meet the following elements: (1) the product had a defect or nonconformity covered by the express warranty; (2) the product was presented to an authorized representative of the manufacturer for repair; and (3) the manufacturer or its representative did not repair the defect or nonconformity after a reasonable number of attempts to repair. *Gonzalez v. Ford Motor Co.*, No. 19-652, 2019 WL 1364976, at *5 (C.D. Cal. Mar. 22, 2019) (citing *Arteaga v. Carmax Auto Superstores W. Coast, Inc.*, No. 14-1888, 2014 WL 3505527, at *3 (C.D. Cal. July 11, 2014)).

"Under the [SBA], a plaintiff must plausibly allege, among other things, that 'the vehicle had a nonconformity covered by the express warranty that *substantially impaired* the *use, value* or *safety* of the vehicle.'" *Uddin v. Automoboli Lamborghini America, LLC*, -- F. Supp. 3d --, No. 24-02532, 2025 WL 458421, at *11 (N.D. Cal. February 11, 2025) (quoting *Donlen v. Ford Motor Co.*, 217 Cal. App. 4th 138, 152, 158 Cal. Rptr. 3d 180 (2013) (emphasis in the original).

The SBA "should be given a construction calculated to bring its benefits into action[,]" and is principally intended to protect the consumer. *Kwan v. Mercedes–Benz of N. Am., Inc.*, 23 Cal. App. 4th 174, 184 (1994).

Armstrong alleges his vehicle had a purported coolant line defect covered under the express warranty. (SCAC ¶ 154). He further alleges he presented his vehicle to an authorized BMW dealership for repair and that the subsequent repair(s) did not remedy the alleged defect. (*Id.* at ¶¶ 24, 155). The SCAC additionally alleges the purported coolant line defect is safety related. (*Id.* at ¶¶ 9, 15, 58, 108). These allegations are sufficient to state a claim for breach of an express warranty under the SBA.

Contrary to Defendant's assertion that Armstrong's SBA "must fail" because the relevant repairs were sought after the warranty expired, case law suggests otherwise. *See Rutledge v. Hewlett-Packard Company*, 238 Cal. App. 4th 1164, 1182-85 (2015), *as modified on denial of reh'g* (Aug. 21, 2015) (plaintiff, who submitted her computer for repair twice during the warranty period, and then experienced a defect a third time, six months after the expiration of the warranty period, did state a claim for failure to repair, which is a breach of warranty) (citing *Jensen v. BMW of North America, Inc.*, 35 Cal. App. 4th 112, 41 Cal. Rptr. 2d 295 (3d Dist. 1995), *as modified on denial of reh'g* (June 22, 1995)); *see also Beshwate v. BMW of N. Am., LLC*, No. 17-00417, 2017 WL 4410169, at *7 (E.D. Cal. Oct. 4, 2017) (finding post warranty repairs relevant to show the vehicle was not repaired to conform to the warranty during the warranty period); *Donlen v. Ford Motor Co.*, 217 Cal. App. 4th 138, 149 (2013) (same) (post warranty repair evidence "is relevant to establishing the transmission was not repaired to match the warranty while the warranty was in effect."). Thus, Armstrong plausibly alleges allegations an express warranty claim under the SBA.

### 1. Unconscionability

Caldwell does not allege his vehicle was under warranty when the coolant line defect manifested or when his vehicle underwent repairs. (*See generally* SCAC). However, Caldwell argues the express warranty is unconscionable. (Pls.' Br. 24-26).

A plaintiff may avoid the durational limits of a warranty if allegations indicate that the warranty is unconscionable. *DeFrank*, 2020 WL 6269277, at *17. Plaintiffs allege the mileage and temporal warranty limits are unconscionable because BMW knew of the coolant line defect, Plaintiffs had unequal bargaining power, and no other options for purchasing alternative warranty coverage. (SCAC ¶¶ 106-08; Pls." Br. at 24-26). Defendant argues that BMWs 4-year/50,000-mile NWLW is not unconscionable. (Def.'s Br. at 29-33).

"[U]nconscionability 'has both a procedural and a substantive element' but 'need not be present in the same degree.'" *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1089 (9th Cir. 2024) (citing *OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 125 (2019)); *Rodriguez v. Raymours Furniture Co.*, 138 A.3d 528, 541 (N.J. 2016). Procedural and substantive unconscionability are evaluated on a sliding scale. *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1260 (9th Cir. 2017). Substantive unconscionability focuses on whether the actual terms of an agreement are "overly harsh" or "shock the court's conscience." *See Miller v. Ford Motor Co.*, 620 F. Supp. 3d 1045, 1057 (E.D. Cal. 2022); *Skeen, LLC*, 2014 WL 283628, at *13; *see also DeFrank*, 2020 WL 6269277, at *18 ("to plead substantive unconscionability, *i.e.*, that a contract term "is excessively disproportionate, involving an exchange of obligations so one-sided as to shock the court's conscience.") (citation omitted). Procedural unconscionability focuses on "oppression" arising from unequal bargaining power and "surprise" due to hidden terms. *Miller*, 620 F. Supp. 3d at 1057.

A 4 year/50,000-mile vehicle warranty is not *per se* unconscionable. *See Goldstein v. Gen. Motors LLC*, 445 F. Supp. 3d 1000, 1015 (S.D. Cal. 2020); *Skeen*, 2014 WL 283628, at *14. Plaintiffs allege that the warranty limits are substantively unconscionable because BMW knew of the coolant line defect and its attendant safety risks but concealed the coolant line defect from Plaintiffs at the time of sale. (SCAC ¶ 108). However, "'simple knowledge of a defect does not

render a warranty unconscionable.'" *Craft*, 2024 WL 5197080, at *6 (quoting *Taylor v. BMW of N. Am., LLC*, No. 20-1994, 2021 WL 1186777, at *10-11 (D.N.J. Mar. 29, 2021), *dismissed*, No. 21-1933, 2021 WL 5272228 (3d Cir. July 26, 2021); and citing *Seifi v. Mercedes-Benz USA, LLC*, 2013 WL 2285339, at *5 (N.D. Cal. May 23, 2013) (finding 4 year/50,000 mile warranty not unconscionable even accepting as true that Mercedes knew about defective gears)); *see also Ponzio,* 447 F. Supp. 3d at 256 (New Jersey District Courts have "held that a manufacturer's knowledge that a part may ultimately fail does not, alone, make a time/mileage limitation unconscionable."); *Alban*, 2011 WL 900114, at *9 ("[A]llegations that BMW knew that the sound insulation in his vehicle would fail after the expiration of the warranty agreement do not indicate that the time and mileage limitation clause was unconscionable."); *Henderson v. Volvo Cars of North America*, LLC, No. 09-4146, 2010 WL 2925913, at *9 (D.N.J. July 21, 2010) (a manufacturer's mere knowledge that a part will ultimately fail, after the expiration of a warranty period . . . does not alone make [a] time/mileage limitation unconscionable."). *Accord Seifi v. Mercedes-Benz USA, LLC*, 2013 WL 2285339, at *5 (N.D. Cal. May 23, 2013) (even accepting allegation that manufacturer knew about defect, warranty's 4-year/50,000-mile limits not unconscionable since it did not "shock the conscience"); *Sonneveldt v. Mazda Motor of Am., Inc.*, 2021 WL 4813753, at *9 (C.D. Cal. July 29, 2021) (same); *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 993–94 (N.D. Cal. 2010), *aff'd*, 462 F. App'x 660 (9th Cir. 2011) (rejecting unconscionability argument where warranty was nonnegotiable contract and contained durational limitation despite allegedly known, latent defect); *Grasso v. Electrolux Home Prod., Inc.*, 2016 WL 2625746, at *2 (S.D. Fla. Mar. 24, 2016) (citation omitted) (unconscionability cannot be premised solely on allegations that defendant knew defect might arise); *Licul v. Volkswagen Grp. of Am., Inc.*, No. 13-61686, 2013 WL 6328734, at *3 (S.D. Fla. Dec. 5, 2013) ("However,

unconscionability of an express warranty requires more than a defendant's mere knowledge of a defect at the time of sale."); *Monsanto Agric. Prods. Co. v. Edenfield*, 426 So.2d 574, 579 (Fla. Dist. Ct. App. 1983) (warranty not unconscionable and suggesting that defendant's knowledge of latent defect is insufficient, standing alone, to render time and mileage limitations unconscionable); *McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1359 (N.D. Ga. 2013) ("Defendants' knowledge of the alleged defect at the time of sale, standing alone, is insufficient to render [] time and mileage limitations unconscionable."). "Warranty limits may be unconscionable where a plaintiff pleads additional facts such as a defendant's manipulation of warranty terms to avoid coverage." *See Craft*, 2024 WL 5197080, at *6 (citation omitted); *see also* Paolucci v. FCA US LLC, 2024 3355390, at *3 n. 6 (D.N.J. July 9, 2024) (finding unconscionability argument unavailing where amended complaint contains no allegations that defendant manipulated the warranty terms to render them unconscionable); *Taylor v. BMW of N. Am., LLC*, 2021 WL 1186777, at *11; *Gelis v. Bayerische Motoren Werke Aktiengesellschaft*, No. 17-07386, 2018 WL 6804506, at *6 (D.N.J. Oct. 30, 2018). However, here, Plaintiffs have not alleged manipulation or other facts to suggest that the NVLW durational limits were overly harsh or shocked the conscience.

Plaintiffs also claim procedural unconscionability because they lacked pre-sale knowledge of the coolant line defect, and they were unable to negotiate the terms of the warranties. (SCAC ¶ 107; Pls.' Br. at 25). There is a lack of consensus from courts on whether these allegations are sufficient. *Compare, e.g., Fisher v. Honda N. Am., Inc.*, No. 13-09285, 2014 WL 2808188, at *9 (C.D. Cal. June 12, 2014) (finding broad allegations of lack of meaningful choice and gross disparity in bargaining power on warranty limits do not establish procedural unconscionability); *Licul*, 2013 WL 6328734, at *3 (finding allegations that "Volkswagen's knowledge of the

defective Door Locks resulted in a 'substantial disparity in the parties' relative bargaining power'"

insufficient to support a finding of procedural unconscionability); *Alban*, 2011 WL 900114 at *9

(finding plaintiffs allegations that they had no meaningful choice to determine the warranty and

that there was a gross disparity in bargaining power between the parties conclusory), *with*

*DeFrank*, 2020 WL 6269277, at *18 (finding procedural unconscionability where plaintiffs alleged

"no meaningful opportunity to participate in creating the warranty, that SEA is a national enterprise

which dictated the warranty's terms, that they could not alter the warranty, and that SEA had

superior knowledge of the defect and concealed it."); *Stratis v. BMW of N. Am., LLC*, No. 22-

06929, 2023 WL 3092188, at *9 (D.N.J. Apr. 26, 2023) ("imbalance of knowledge regarding the

existence of a defect can create the disparate bargaining power required to show procedural

unconscionability at the motion to dismiss stage").

The Court finds Plaintiffs procedural unconscionability allegations insufficient. Plaintiffs

do not allege that they tried to negotiate the warranty terms. Nor do Plaintiffs allege they

unsuccessfully sought other warranty alternatives from BMW or a third-party.[20] *See, e.g.,*

*Marchante v. Sony Corp. of Am., Inc.*, 801 F. Supp. 2d 1013, 1022 (S.D. Cal. 2011).

Moreover, the terms of the warranty are reasonable; to the extent any procedural

unconscionability existed it would not slide the scale in favor of unconscionability. Even so, both

procedural and substantive unconscionability must be present for a court to invalidate a contract

---

[20] While allegations of less bargaining power and "no meaningful choice in setting the terms of the warranty" have been found sufficient to plead procedural unconscionability, *see, e.g., Skeen*, 2014 WL 283628, at *14, the Court notes the Third and Ninth Circuits have rejected the proposition that lack of warranty choice or ability to negotiate equates to a lack of lack of bargaining power. *See Werwinski v. Ford Motor Co.*, 286 F.3d 661, 673 (3d Cir. 2002) (Although car purchasers—whether ordinary consumers or businesses—may be unable to negotiate the specific details of their automobile warranties, or may be able to select among only limited options, purchasers certainly do not lack bargaining power. Purchasers have the freedom to chose[sic] a less expensive car with a limited warranty or a more expensive car with a longer-term warranty, and they often have the option of buying an extended warranty); *see also Smith v. Ford Motor Co.*, 462 F. App'x 660, 663–64 (9th Cir. 2011) ("[P]laintiff was presented with a meaningful choice, . . . the option of purchasing a different vehicle from a different manufacturer, . . . .").

or clause. *Miller*, 620 F. Supp. 3d at 1057. Since Caldwell fails to sufficiently plead that the NVLW mileage and temporal warranty limits are unconscionable, Count Four is dismissed without prejudice as to Caldwell.

### ii.      UCC Implied Warranty Claims

Defendant moves to dismiss Plaintiffs' implied warranty claims because the duration of any implied warranties was limited to the duration of the NVLW. (Def.'s Br. at 25). Defendant argues that Caldwell fails to allege the purported coolant line defect existed at the time of sale as required under Florida law. (*Id.* at 27). Plaintiffs argue that it has not been established that Plaintiffs ever received any disclaimers prior to their purchase and that Caldwell does plead the alleged defect existed at the time of sale (Pls." Br. at 27). The Court addresses each argument in turn.

To state a claim for breach of the implied warranty of merchantability, a plaintiff must sufficiently allege that "a defect renders the vehicle unfit for its ordinary purpose of providing transportation for its owner." *Stevenson v. Mazda Motor of Am., Inc.*, No. 14-5250, 2015 WL 3487756, at *13 (D.N.J. June 2, 2015) (internal quotation marks omitted) (quoting *Sheris v. Nissan N. Am. Inc.*, No. 7-2516, 2008 WL 2354908, at *6 (D.N.J. June 3, 2008). "A claim for breach of implied warranty must ordinarily arise shortly after purchase—there will typically be no claim for breach of implied warranty where plaintiffs have driven their cars without problems for years." *Skeen*, 2014 WL 283628, at *16 (internal quotation marks omitted). Furthermore, a lawsuit must be brought within a warranty's duration in order to assert a claim for its breach; implied warranties such as the implied warranty of merchantability expire upon expiration of any express warranties for that same product. *N.J. Transit Corp. v. Harsco Corp.*, 497 F.3d 323, 329-30 (3d Cir. 2007) (dismissing breach of implied warranty of merchantability claim where damage arose after the express warranty had expired).

### 1.  NVLM Limitation

The NVLW limits "the duration of any implied warranties, including the implied warranty of merchantability" to the duration of the express warranty. (Dalton Decl., Ex. B at 2). Such limitations are permitted under both California and Florida law. *Pascal v. Nissan N. Am., Inc.*, No. 20-00492, 2022 WL 2784393, at *5 (C.D. Cal. June 8, 2022) ("Under California law, a manufacturer may place limitations on implied warranties.") (citing Cal. Com, Code § 2316; Cal. Civ. Code § 1791.1(c)); Fla. Stat. § 672.316.

Notwithstanding that the NVLM was limited to the duration of the express warranty, Armstrong alleges the purported coolant line defect first occurred within one year of purchasing his vehicle—during the express warranty period. (SCAC ¶¶ 20, 23-24). Additionally, Plaintiffs allege the coolant lines are not maintenance items and should last for the useful life of the vehicle and that the purported defect effected their safety. (*Id.* at ¶ ¶¶ 9, 15, 58, 74). As such, Armstrong plausibly pleads an implied warranty claim. *Bang*, 2016 WL 7042071, at *7 (rejecting argument that vehicles complied with implied warranty because "[p]laintiffs have alleged that the Oil Consumption Defect is likely to cause catastrophic engine failure, which may cause a life-threatening accident"); *Schechter v. Hyundai Motor Am.*, No. 18- 13634, 2019 WL 3416902, at *14 (D.N.J. July 29, 2019) (holding "that a breach of the implied warranty can be based on an alleged safety defect of a vehicle"). *See also Nelson v. Nissan N. Am., Inc.*, 894 F. Supp. 2d 558 (D.N.J. 2012) (finding allegations of transmission problems within the warranty period sufficient to plead a breach of the implied warranty); *Henderson*, 2010 WL 2925913, at *9–10 (finding that allegations of slippage, hesitation, harshness and unexpected transmission failure which rendered vehicles unfit for the ordinary purpose of driving are sufficient to survive a motion to dismiss). *Cf. Hurst v. BMW of N. Am. LLC*, No. 22-3928, 2023 WL 4760442, at *6 (D.N.J. July 26, 2023)

(finding no implied warranty claim where plaintiff "was able to, and in fact did, use the car for the *ordinary* purpose for which cars are used generally, which is transportation.") (emphasis in the original); *Gujral v. BMW of N. Am., LLC*, No. 19-20581, 2022 WL 3646627, at *4 (D.N.J. Aug. 23, 2022) ("'[W]hile the safety risk alleged here may be of a different nature than the risks alleged in other vehicle-defect cases from this District," whether the Fire Defect "posed enough of a safety risk to actually hamper the Class Vehicles' ability to provide safe, reliable transportation is ultimately a question of fact to be resolved at summary judgment or by a jury") (citation omitted); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, No. 16-2765, 2017 WL 1902160, at *15 (D.N.J. May 8, 2017) (finding plaintiff sufficiently pleaded an implied warranty claim where he alleged that his vehicle's defect "led to failure of the vehicle in general"); *Sheris v. Nissan N. Am. Inc.*, 2008 WL 2354908, at *5-6 (D.N.J. June 3, 2008) (stating that a vehicle's ordinary purpose is to provide transportation).

### 2. Receipt of Warranty Disclaimers

Plaintiffs posit that the implied warranty disclaimers are not enforceable because they did not receive them at the time of sale. (Pls.' Br. at 27). *See, e.g., Clark v. LG Elecs. U.S.A., Inc.*, No. 13-485, 2013 WL 5816410, at *12 (S.D. Cal. Oct. 29, 2013) ("Disclaimers of implied warranties must be made available to the consumer prior to the sale of the product in order to be binding on the consumer."); *American Coach Lines of Orlando, Inc. v. N. Am. Bus Indus., Inc.*, 2011 U.S. Dist. LEXIS 14417, 2011 WL 653524, at *10 (M.D. Fla. Feb. 14, 2011) ("[A] disclaimer of implied warranties must be part of the 'sales bargain between the parties,' and a disclaimer first provided to the purchaser subsequent to a sale is invalid."). However, another Court in this District rejected a similar argument. *Craft*, 2024 WL 5197080, at *7. The *Craft* court reasoned that BMW's

warranties are publicly available online,[21] and that "it is incongruous for Plaintiff[s] to argue that the implied warranty limitations contained in the NVLW are not binding because [they] never received them while also seeking to extend the benefits of the warranty [they] insist[] did not form the basis of the bargain." *Id.*

### 3.  Whether Caldwell Alleged the Defect Existed at the Time of Sale

Contrary to Defendant's assertion, Caldwell alleges that the coolant line defect existed at the time of sale. (SCAC ¶ 191 ("Contrary to the applicable implied warranties, the Class Vehicles and their engines *at the time of sale* and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and the other Class members with reliable, durable, and safe transportation.")) (emphasis added).

However, Caldwell has not alleged the purported coolant line defect manifested in his vehicle during the warranty period.  (*See generally* SCAC). As such, Caldwell fails to sufficiently plead a claim for an implied warranty. To the extent Caldwell's implied warranty is limited to the duration of the express warranty, and the coolant line defect manifested after the warranty period, the breach of implied warranty claim must fail. *See, e.g., Brisson v. Ford Motor Co.*, 349 F. App'x 433, 434-35 (11th Cir. 2009); *Speier-Roche v. Volkswagen Grp. of Am., Inc.*, No. 14-20107, 2014 WL 1745050, at *8 (S.D. Fla. Apr. 30, 2014). However, the coolant leak occurred five months after purchase. (SCAC ¶¶ 32, 36). Thus, if Caldwell alleges an operative warranty, he may have an implied warranty claim. However, the SCAC as currently plead is deficient. Accordingly, as to Caldwell, Count Eight is dismissed without prejudice.

---

[21] See Maintenance Resources | BMW USA.

### G. Unjust Enrichment

Defendant argues there is no cause of action for unjust enrichment under California law and that under Florida jurisprudence such a claim fails when it is duplicative of legal claims. (Def.'s Br. at 33-34). Plaintiffs respond that BMW relies on "outdated" case law as to California law and that unjust enrichment claims can be pled in the alternative under Florida law. (Pls.' Br. at 30-31). The Court addresses Plaintiffs unjust enrichment claim under each State in turn.

**California:** In Count Eleven, Armstrong purports to assert an unjust enrichment claim under California common law on behalf of himself and the California subclass. There is a divergence of authority on the issue of whether California permits standalone claims for unjust enrichment.

Notwithstanding, even if, as Defendant argues, there is no claim for unjust enrichment under California law, a court may construe unjust enrichment "as a quasi-contract claim seeking restitution.'" *Craft*, 2024 WL 5197080, at *7 (citing *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014); *McGuire v. BMW of N. Am., LLC*, 13–7356, 2014 WL 2566132, at *3 (D.N.J. June 6, 2014) ("New Jersey does not recognize unjust enrichment as an independent tort cause of action.")).

However, "unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement exists defining the rights of the parties." *Craft*, 2024 WL 5197080, at *7 (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996); *Resnick*, 2017 WL 1531192, at *22 ("[a]n action based on quasi-contract cannot lie where a valid express contract covering the same subject matter exists between the parties." (internal quotes and citation omitted)); *see also Rose*, 2024 WL 1209185, at *12 ("where there is an express contract

covering the identical subject matter of the claim, plaintiff[s] cannot pursue a quasi contractual claim for unjust enrichment." (internal quotes and citation omitted)). "A breach of an express warranty covers the same subject matter as a breach of an express contract." *Roper v. Big Heart Pet Brands, Inc.*, 510 F. Supp. 3d 903, 924-25 (E.D. Cal. 2020) (citing *Smith v. Allmax Nutrition, Inc.*, No. 15-00744, 2015 WL 9434768, at *10 (E.D. Cal. Dec. 24, 2015)). Thus, Plaintiff's quasi-contract claim fails. *See, e.g.*, *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1159 (S.D. Cal. 2021) (dismissing quasi-contract claim with prejudice because plaintiffs cannot bring quasi-contract claim while bringing an express warranty claim); *see also Miller*, 620 F. Supp. 3d at 1077-78 (dismissing unjust enrichment claims with prejudice due to existence of express agreements even where express and implied warranty claims were also dismissed because claims occurred outside warranty timeframe). Thus, the unjust enrichment claim in Count Nine is dismissed with prejudice as to Armstrong and the California subclass.

**Florida:** In Count Eleven, Caldwell purport to assert an unjust enrichment claim under Florida common law on behalf of himself and the Florida subclass. Under Florida law, "unjust enrichment is an equitable remedy which necessarily fails upon a showing that an express contract exists." *Alvarez v. Royal Caribbean Cruises, Ltd*, 905 F. Supp. 2d 1334, 1341 (S.D. Fla. 2012) (citation omitted). An unjust enrichment claim can only be pled in the alternative if one or more parties contest the existence of an express contract governing the subject of the dispute. *See, e.g., Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1227 (S.D. Fla. 2010). As an equitable remedy, an unjust enrichment claim cannot be maintained where a plaintiff has an adequate remedy at law. *Zarrella*, 755 F. Supp. 2d at 1227. Here, because BMW's warranties constitute valid contracts, such a claim is precluded on that basis. *See Koski v. Carrier Corporation*, 347 F. Supp. 3d 1185, 1195 (S.D. Fla. 2017) ("[A] plaintiff cannot maintain a claim for unjust enrichment if

there is an express warranty governing the plaintiff's rights.") (citations omitted). Additionally, because there are adequate remedies at law available through Plaintiffs fraud-based and warranty claims, the unjust enrichment claim is duplicative and must fail. *See Speier-Roche*, 2014 WL 1745050, at *8 (S.D. Fla. Apr. 30, 2014) ("Plaintiff's failure to state a claim for breach of warranty does not save the unjust enrichment claim."). At this juncture, whether Plaintiffs' other causes of action have merit is immaterial to saving the unjust enrichment claim. *See Licul*, 2013 WL 6328734, at *8 n.2 (S.D. Fla. Dec. 5, 2013) ("That Plaintiffs' warranty and FDUTPA claims may also prove without merit does not impact whether their unjust enrichment claim should be dismissed as duplicative.").[22] Accordingly, the Florida unjust enrichment claim is dismissed with prejudice as to Caldwell and the Florida subclass.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss (ECF No. 39) is **GRANTED IN PART**. Counts Five brought under California law, Seven and Eight brought under Florida law, as well as Counts Seven, Eight, Nine, Ten, and Eleven to the extent they are brought by a nationwide class are **DISMISSED without prejudice**. Count Eleven is **DISMISSED with prejudice**. All other claims for relief are **DENIED**. An appropriate Order accompanies this Opinion.


DATED: March 31, 2025

JULIEN XAVIER NEALS
United States District Judge

---

[22] While a plaintiff may plead unjust enrichment as an alternative theory to a legal cause of action, *see Licul*, 2013 WL 6328734, at *7, "where the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief but rather is duplicative of those legal causes of action" and warrants dismissal. *Id.* (dismissing unjust enrichment claim because it relied on the same wrongdoing addressed by the plaintiffs' FDUTPA claim). Here, the Plaintiffs' unjust enrichment claim relies on the same factual predicate as all of their other claims.